## HIGBEE v. OWENS.

No. 20582. Opinion Filed Dec. 22, 1931.

Withdrawn, Corrected, Refiled, and Rehearing Denied Feb. 9, 1932.

John W. Willmott, Richard J. Roberts, and Joseph C. Looney, for plaintiff in error.

Bob Kerr, for defendant in error.

SWINDALL, J. The action was based upon the publication of an affidavit made by the defendant, a copy of which is as follows:

"Affidavit

"E. C. Higbee, of lawful age, being first duly sworn deposes and says:

"That he is Superintendent of the Cromwell Public Schools, School Dist. No. 11, Seminole County, Oklahoma, in such position he is in a position to observe his teachers at all times during the school term.

"That during the last school term Miss Elsie Windel, now Mrs. Smith and Lola B. Owens acted unladylike in a conduct unbecoming a school teacher.

"That several of the patrons of the school have approached him at different times and told him that they would not send to school this term if the two above mentioned teachers taught.

"That in his opinion they are unfit to teach in his school and for this reason he has failed to endorse their contracts to the County Superintendent for his approval, as is customary for him to do with the other teachers.

"Signed this the 16th day of September, 1926.

[Signed] "E. C. Higbee."
[Notarization]

The plaintiff had been employed as a teacher in the Cromwell school during the school year of 1925-1926: and prior to the making and approval of the annual estimate for the following year the school board of Cromwell had entered into a purported written contract with the plaintiff to teach the following year, the school year of 1926-1927.

The plaintiff alleged that by reason of the publication of the affidavit, which she alleged to be false and libelous, the county superintendent of schools refused to approve her contract, and that she thereby lost her monthly salary of $125 per month for nine months, and was otherwise damaged and humiliated.

The defendant in his amended answer admitted the publication of the affidavit, and alleged that it was done in the performance of duty, and in the utmost good faith, in the interests of the schools of the district, and to his superior in line of duty; and that, therefore, the affidavit was a privileged communication.

The defendant also alleged the truth of the matters stated in the affidavit, and alleged that during the preceding school year the plaintiff had acted in an unladylike manner and in a manner unbecoming a school teacher, in that she spent much time in and around Field's Drug Store in the town of Cromwell, in the nighttime as well as in the daytime; and that during that time the store had a bad reputation in the town as being a place where whisky and "jake" were kept and sold; that during said time the plaintiff frequented Clark's Drug Store in said town, which had a like reputation; that during the latter part of the preceding year and during the preceding summer prior to the making of the affidavit several patrons approached him, at different times and told him that they would not send their children to school that term if Lola B. Owens and Elsie Windel taught, assigning their aforesaid conduct, "among other things," as reasons therefor; and that by reason of the conduct of the said Lola B. Owens as therein set forth and the complaints made to him by said patrons concerning her conduct in those particulars and others, she became unfit, in his opinion, to teach in the school system at Cromwell.

To the amended answer the plaintiff replied with a general denial, a specific denial of good faith, and a specific denial of the allegation that the matters alleged in the affidavit were true.

The case went to trial, not only upon the contention that the affidavit had been made in good faith, but on an affidavit alleging that the defendant had been in a position to observe the plaintiff's conduct and allegations specifically based upon such observation, and also upon a square issue of the truth of what had been alleged in the affidavit; and the charges of unladylike conduct and conduct unbecoming to a school teacher had been rendered specific by alleging that she frequented the drug stores, and that complaints had been made of her conduct.

There was nothing in the affidavit to indicate that any complaints were made of anything not known to the affiant personally, but in the amended answer, following the allegation of the truth of the charge of unladylike conduct and conduct unbecoming

to a school teacher, after the specifications of alleged fact, the charge of frequenting and loitering in drug stores having the reputation of violating the prohibition laws, the defendant went on and alleged that complaints had been made of that and of other things, not specifying what those other things were, or whether they were of matters which he claimed to know to be facts, or of things which he merely relied on as being true because of the complaints. These "other things" would only be material on the issue of good faith, as the answer did not allege that the other things complained of were true. In fact no effort was made to prove the truth of anything except the charge of frequenting and loitering in drug stores, with the exception of one other thing that the defendant testified he had observed, once seeing the plaintiff in her pajamas out in the yard at the place where she roomed.

So, upon the issue of truth as to the conduct that was unladylike and unbecoming to a school teacher, there was nothing involved except whether or not the plaintiff frequented and loitered in the drug stores, in the daytime or in the nighttime.

Most of the evidence as to her having been in drug stores came from the plaintiff herself. She testified that when she first came to Cromwell she went to the Field's Drug Store and that for a time she ate her meals there, having been told by a man at the store that the store was catering to the trade of the teachers. Soon after school began she quit going there because of hearing profanity there one night, and she said that after that she was in that store only once during the remainder of the year, and that was to meet some woman from out of town.

The evidence fell far short of proving that the plaintiff frequented drug stores, either in the nighttime or in the daytime, and there was very little evidence of her having even been seen in drug stores. One witness, one Passmore, who was one of the protestants against her employment, only testified to having seen her in a drug store twice, and admitted that there was no other drug store in that end of town. On those occasions she was with other teachers, and they were drinking "pop or coke, or whatever it was," and it does not appear from his evidence that there was any loitering around. When asked if he ever observed anything unladylike in the plaintiff's conduct, he said that he considered the mere fact that she went into such places to be

unladylike. That testimony and his protest, so far as his personal knowledge was concerned, were all upon having seen her in a drug store twice.

Mrs. Wolforth, who was president of the parent teachers association, testified. She was one of the women whom the county superintendent spoke of as having complained of the plaintiff at his office. She admitted having gone there with another woman, but said that they went there about several things, and while she admitted saying that she thought the plaintiff should not be employed for another year, she said that the reason she assigned was that there had been some talk. She testified to having seen the plaintiff in a drug store, but it does not appear that it was more than twice during the year. She testified to some of the parents complaining to her, but said that she did not see why they complained to her, and made it plain in her testimony that she was not saying that she was dissatisfied with the plaintiff. When asked if the plaintiff did frequent drug stores, she said that she thought she did, but that opinion would seem to have been based upon hearsay, as her own observation came far from evidencing such a condition, just as did the evidence of Passmore, who was one that complained and did so with practically no personal knowledge of what he was talking about.

Even the evidence of the defendant, who had positively sworn that as superintendent of schools he was in a position to observe the conduct of the teachers, was of little force on this issue. He did testify to seeing the plaintiff in a drug store, but did not say that it was often, nor that it was after the time she said she had stopped eating at the Field's Drug Store. He said he saw her in a drug store several times, and when asked if he ever observed anything else unladylike in the conduct of the plaintiff, his reply was that on one occasion he saw her in her pajamas out in the yard at the place where she roomed. He admitted that he had been in the Field's Drug Store at least twice.

Two or three other witnesses testified to having seen her in one or another of the drug stores in town, but there was no evidence of her having gone into a drug store more than occasionally. Even a young man who worked at a filling station across from the Rexall Store, who testified to seeing her go into that store, merely said that he saw her more than once and did not say that it was often, and he also said that when

he saw her she was with other teachers, and that they went in and out and did not loiter, and he denied ever seeing anything unladylike in her conduct. Another witness, who was later a deputy sheriff, testified to having seen her twice in the Field's Drug Store, once in the daytime, and once at night, but on the occasion when she was there at night it was with several others. He did not testify that she loitered or that there was anything unladylike in her conduct, nor that it was after the time she testified she had quit going there.

The defendant said that he did not recall speaking to the plaintiff about her conduct at any time during the year. He did not recall having told her about the character of the Field's Drug Store, a fact admitted by the plaintiff as one reason, together with hearing the profanity, that caused her to stop going there, why she did not go into that store but once after that.

On the other hand, in spite of Mrs. Wolforth having complained to the school board because of the urging of some people, the board hired her again. One of the members of the board was called and testified that he had a good opportunity to observe her conduct during the year, that he never saw her do anything unladylike, and that he knew her reputation, and that it was good. Another witness, an attorney practicing at Wewoka, who had been superintendent of schools at Tupelo in 1920, testified that he knew her then and that her reputation was good. Several other witnesses testified to the reputation and conduct of the plaintiff during the year that she taught at Cromwell, and all of them said that it was good, and that they had never observed anything improper in her conduct. Among those witnesses were several who were teachers and had taught in the same school with the plaintiff during the year that she taught in Cromwell, and all of them except one were women, who would naturally be supposed to have better opportunities to observe her conduct for that reason.

No charge was made of lack of professional skill, and it is clear from the evidence that the plaintiff was a skilled, competent teacher.

The county superintendent testified that the contract was never formally presented to him in his office for approval. He did not deny that the contract was there with the other contracts from Cromwell, and his deputy who went out to get the affidavit from the defendant said that he thought it was there and testified that it was for that reason that he went out to get the affidavit. The county superintendent testified that the contract had been presented to him by the plaintiff at Ada during the summer school, and that he told the plaintiff that she should have it approved by the local superintendent and it should be presented at his office, as he transacted such business there. It is clear that complaint had been made and that he knew of some dissatisfaction at the time that the contract was presented at Ada. In fact he admitted that before the end of the preceding school year the defendant himself had said that there was some dissatisfaction. He said that he wanted the affidavit so as to have "something tangible" to enable him to avoid being mandamused. He testified that the affidavit did not prevent the approval of the contract, and that he had already made up his mind not to approve it because of complaints that had been made.

The plaintiff testified that as late as the night before the term opened she talked with the defendant over the telephone about when she could get to Cromwell, and that she arrived at the school grounds the next morning before school opened and was then told by the defendant that if she went in and attempted to teach she would be enjoined, but that he admitted that there was nothing against her except that the county superintendent had not approved her contract. The defendant denied the telephone conversation. Plaintiff testified that then she went to the office of the county superintendent and asked him for a copy of her contract and that he refused to give her a copy.

The jury returned a verdict for the plaintiff for $1,250, being "$950 for salary, and $300 damages."

(1) The defendant complains of the allowance of any damages for loss of salary, and the complaint is based upon the contention that the contract was void because it was executed before the making of the estimate for the year, and upon the further contention that there was no evidence that the district would have adopted it if it had been approved. There was ample evidence to support a finding that it was the affidavit that caused loss of salary. In the first place, it is clear that nobody concerned in the matter considered the contract to be void. Had the county superintendent considered it void, he would not have been scouring around to get something tangible about the conduct and character of the

plaintiff. Further, it was shown that all the contracts, except one or two were executed at the same time, and a member of the board said that it was his recollection that those who had such contracts which were approved served under them. There was ample evidence to justify a finding that had the contract been approved the plaintiff would have served, and that the failure to approve the written agreement resulted in the loss of salary, so that the finding was neither contrary to the law nor unsupported by the evidence.

But the county superintendent denied that the affidavit was the cause of his failure to approve the agreement. That is another complaint that the verdict was not sustained by the evidence, and the answer is that the jury undoubtedly found that the affidavit was the cause of failure to approve the contract. The county superintendent said that he had already made up his mind not to approve the contract, and that he desired the affidavit to enable him to defend a mandamus suit, but in that connection he also said that he wanted the affidavit because he wanted something tangible. There was no evidence that he got anything tangible after that time except the affidavit. If he did not then have anything tangible, it would seem to have been a reasonable conclusion that if he had not got this something tangible, the only fair course, and the course that he would have pursued, would have been to approve the contract. Further, there was another circumstance that might well have indicated some lack of fortitude and resolution on the part of the county superintendent, and that was his alleged conversation when the plaintiff requested him at Ada to approve her contract. The plaintiff said that he promised to approve it, but his testimony was that he told her to get it approved by the local superintendent. That not only indicates that he intended to put considerable reliance upon what the local superintendent might do, but under the evidence it indicates something more, because it was admitted by him that he had been informed by the defendant that there had been complaint against the plaintiff teaching another year. If complaint had been made, it may well be wondered why he did not inform her of that fact, as fairness and justice manifestly required, and his failure to then inform her of that fact was unfair, a willing unfairness or an unfairness resulting from lack of resolution and fortitude. He could with no reasonable degree of intelligence say that the plaintiff, who had spent time and money to prepare herself for her profession, should have no right to protect and vindicate her reputation, and should not have been promptly informed that complaint had been made. He cannot be considered not to have known that if the contract was valid, as they all considered it to be, because otherwise it would have been disapproved, the plaintiff could not contract with another district until released from the one under consideration, so that prompt action was required so far as it was consistent with the exercise of the one duty remaining, approving or disapproving the contract. Further, the jury would not consider that he was not conscious of the fact that if he should fail to approve the contract because of charges made against the plaintiff, it might naturally be expected to have much more serious consequences than the loss of the salary under the contract then under consideration.

Another reason urged was that the contract was never formally presented by the plaintiff at the office of the county superintendent. He did not deny that it was there, and if it was there, he was under a duty both to the plaintiff and to the district to act upon it. It seems difficult to understand why he did not act upon it sooner, if for no other reason than that the district might have an opportunity to act with deliberation and without haste in filling the position intended to be filled by the contract. Even that delay was an evidence of indecision.

Further than that, the jury saw both parties, the plaintiff, who testified that the county superintendent promised to approve it and said that they should all be sent over together, and that she followed his instructions and they also saw the county superintendent, and had an opportunity to observe the manner of both, as well as the circumstances above mentioned, none of which at all indicate fairness or resolution in the performance of a duty.

Under another specification of error relating to the instructions the defendant contends that there was no evidence of actual malice or malice in fact, and urges that instead of merely reversing the judgment for a new trial, it should be reversed with instructions to dismiss, for that reason and the further alleged reason that it is apparent that the plaintiff cannot succeed in the action. That argument should properly have been urged upon the contention that the verdict was not sustained by sufficient evidence or was contrary to law, or error

in overruling the motion for a directed verdict.

The evidence failed to prove the truth of the charges alleged; it disclosed what conduct had been observed by the defendant; it further appeared that although the plaintiff and defendant were in daily contact at the school building, the defendant could not recall ever having talked with the plaintiff about her conduct; and the evidence wholly fails to show that she ever knew prior to the making of the affidavit that there had ever been a complaint of her conduct, and that even in answer to a question on the first day of school the defendant denied that there was anything against the plaintiff other than the bare fact that the county superintendent had failed to approve the contract, even then not informing her of the real facts. The effect of those circumstances and the other evidence, including the fact of complaint having been made to the defendant, was for the determination of the jury on the issue of malice.

(2) The defendant complains of the refusal of the court to instruct the jury that the affidavit was a qualifiedly or conditionally privileged communication, and a refusal to instruct that since it was a qualifiedly or conditionally privileged communication, the burden was upon the plaintiff to prove malice. Both of the instructions were refused, but the court did instruct the jury that the burden was upon the plaintiff, not only to prove malice, but also to prove that the charges were untrue, so that the instructions were even more favorable than the requested instructions that were refused. The first instruction above was a mere abstract charge that would require explanation, and the second one that was refused was not only less favorable to the defendant than the instruction actually given, but it was erroneous, as was the instruction given, in putting upon the plaintiff the burden of proving malice, and the instruction given was also erroneous in not putting the burden of proof as to truth upon the defendant. The defendant does cite cases holding that the burden is upon a plaintiff to prove that a communication made upon an occasion of qualified or conditional privilege is malicious, but those cases hold to the common-law rule and ignore the provisions of our statutes. Section 497, C. O. S. 1921, lists several instances of privilege, but does not list the privilege here claimed, and it then provides:

"In all cases of publication of matter not privileged under this section, malice shall be presumed from the publication, unless the fact and the testimony rebut the same. No publication which, under this section, would be privileged, shall be punishable as libel."

So that the publications listed are absolutely privileged, and as to all others there is a presumption of malice that prevails until rebutted by the facts and the evidence. The correct rule under our statutes was announced in German-American Ins. Co. v. Huntley et al., 62 Okla. 39, 161 Pac. 815, which held that under the statute malice is presumed and the burden of proof is upon the defendant. The defendant cites that case on the point that if the circumstances are undisputed, the question of whether the communication was privileged, whether the fact and the testimony rebut the presumption of malice, is for the court. That statement is correct, but it does not apply to this case, for the circumstances were in dispute. The part of that opinion that bears upon this case is as follows:

"The 'fact,'—i. e., the circumstance of the publication in the instant case—was undisputed, but the good faith of the defendant being controverted, was a question for the jury to determine. If the testimony established that the defamatory matter was bona fide believed to be true from reasonable cause and the occasion was employed from a proper motive, then the publication was privileged, and such privilege afforded a complete defense to plaintiff's cause of action." German-American Ins. Co. v. Huntley et al., supra.

(3) The defendant complains of a refusal to direct a verdict in his favor. Such refusal was proper under our conclusions as to matters hereinbefore discussed. Since there was an allegation of special damage and proof of special damages, a further contention of the defendant that the charges were not libelous per se needs no extended discussion, but it does seem to us that the charges were well calculated to injure, and that since they were spoken of the plaintiff with reference to her profession, it would require a vivid imagination to consider them not actionable per se. It is to be observed that the defendant cited only the abstract rule dividing words into those not possibly having a defamatory meaning, those susceptible of a defamatory meaning as well as an innocent meaning, and those that are clearly defamatory. It appears to us that these charges fell clearly within the last class.

(4) The defendant also urges error in the amount of recovery, insisting that the jury did not allow full credit on the salary

for all that plaintiff earned during the year from other sources. He insists that the credits would reduce the lost salary to $800 instead of $950 allowed by the jury. This court has repeatedly held that it will not attempt to review any such alleged error unless the ground was alleged in the motion for a new trial. No such ground was set up in the motion for a new trial, or in the petition in error. It is first contended in the brief. The Code of Civil Procedure contains two grounds for objection to the amount of a verdict, both of which appear as part of section 572, C. O. S. 1921, and are as follows:

"Fourth. Excessive damages, appearing to have been given under the influence of passion or prejudice.

"Fifth. Error in the assessment of the amount of recovery, whether too large or too small, where the action is upon a contract, or for the injury or detention of property."

The verdict was certainly not the result of passion or prejudice, and no such ground was alleged. The ground of error in the assessment applies only to actions upon contract or for the injury or detention of property. So, there is no express provision of that section which would authorize such a ground for new trial, and yet it is clear that the element of damage for lost salary is one governed in amount by the limit of contractual liability, though the action was not upon the contract, but in an action for libel. Although the grounds for a new trial set forth in that section do not cover this situation, yet the trial court had inherent power to correct its proceedings during the term, and had the error been pointed out to the trial court in a motion for a new trial or otherwise, it should have granted a new trial or reduced the judgment by the amount of the erroneous allowance, if any, as there was nothing involved but a matter of calculation, and a refusal so to do would have been reviewable in this court, but as it is, the case falls within the doctrine above announced, that the ground of error will not be reviewed because not presented to the trial court. Graham v. Yates et al., 36 Okla. 148, 128 Pac. 119; Southwestern Cotton Seed Oil Co. v. Bank of Stroud et al., 12 Okla. 168, 70 Pac. 205.

Judgment affirmed.

LESTER, C. J., and RILEY, HEFNER, CULLISON, ANDREWS, and McNEILL, JJ., concur. KORNEGAY, J., dissents. CLARK, V. C. J., absent.

Note.—See under (1) annotation in L. R.

A. 1916B, 564; 2 R. C. L. 193 et seq.; R. C. L. Perm. Supp. p. 368; R. C. L. Pocket Part, title Appeal, § 167. (2) 17 R. C. L. 417, 427; R. C. L. Perm. Supp. pp. 4280, 4283.